IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT
SOUTHERN DIVISION

DUANE OWENS and PARTNERS MATTER, LLC                Case No.

                              Plaintiffs,

                                                     Hon.
                                                     Mag.

v.

NORTH AMERICAN BANCARD,                **COMPLAINT FOR FRAUD,**
MARC GARDNER and DAVID GREENBERG        **FRAUDULENT INDUCEMENT,**
                                          **TORTIOUS INTERFERENCE**
                   Defendants.          **WITH BUSINESS OPPORTUNITY,**
                                          **CIVIL CONSPIRACY, ET AL.**

_____

NATALIE C. QANDAH (P58434)
Vida Law Group, PLLC
Attorneys for Plaintiff
43050 Ford Road, Suite 160
Canton, MI 48187
PH: (734) 456-9004
natalie@vidalawpllc.com
_____/

**<u>VERIFIED COMPLAINT AND JURY DEMAND</u>**

       Plaintiff, Duane Owens ("Owens") and Plaintiff Partners Matter, LLC ("PM") (together,

"Plaintiffs"), by and through their undersigned counsel, states the following for his Complaint

and Jury Demand against Defendants North American Bancard ("NAB"), Marc Gardner

("Gardner") and David Greenberg ("Greenberg") (together, "Defendants"):

## Parties, Jurisdiction and Venue

1.      Owens is a male individual over the age of 18.  At all relevant times, Owens resided in Milford, State of Michigan.  PM is a limited liability company registered to do business in the State of Michigan.

2.      NAB is a Delaware limited liability company registered to do business in the State of Delaware.

3.      Gardner is a male individual over the age of 18.  At all relevant times, Gardner resided and engaged in business in the Eastern District of Michigan.

4.      Gardner is the President and Chief Executive Officer ("CEO") of NAB, and throughout Owens' employment and post-employment with NAB, Gardner was acting within the course and scope of his position as President and CEO, he had power and control over the terms and conditions of Owens' employment, he exercised ultimate authority over Owens' employment, and he had power and control over the actions that took place pre- and post-Owens' employment.

5.      Greenberg is a male individual over the age of 18.  Greenberg is a resident of the State of New York.

6.      Greenberg is the Chief Administrative Officer of NAB, and oversees the legal department for NAB.

7.      This Court has jurisdiction pursuant to 28 U.S. §1332 and 15 U.S.C. §1121.

8.      This Court has personal jurisdiction over the Defendants because each resides in or engages in continuous and systematic business within the State of Michigan and maintains a substantial physical presence in this State.

9.      Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs are located in, and the unlawful acts alleged in this Complaint occurred within the Eastern District of Michigan.

10.     The amount in controversy exceeds $75,000.00, exclusive of costs, interest and attorney fees.

11.     This Court has proper jurisdiction over this lawsuit.

## Factual Allegations

12.     Plaintiffs incorporates by reference the foregoing paragraphs as though fully set forth herein.

13.     NAB is a company operating in the payment technology services industry offering its business merchants a variety of services, including, credit card processing, point of sale, e-commerce/gateway, mobile payments, and cash advances.

14.     Owens has over 10 years of experience in the point of sale and payment technology services industry; and over 30 years of experience in the restaurant industry.  He is well-known in these industries, particularly for his expertise in restaurant technology sales, dealer operations, customer service, relationship management, sales and technical support. Owens has further developed his own unique proprietary methodology in the area of:  (i)

sales strategy; (ii) vendor relationship development; and (iii) vendor relationship

management.

15.     In 2016, Plaintiff was presented with multiple job opportunities, one of which was an

offer from NAB by and through its wholly owned subsidiary NAB-CDI, LLC ("CDITech").

16.     On March 28, 2016, NAB offered Plaintiff the position of General Manager of

CDITech (**Exh. A**, Offer Letter).

17.     Specifically, the Offer Letter describes a compensation schedule as follows:

$125,000.00 annual salary with an incentive plan as follows:

> Base Level EBITDA - $350,000
> $350,000-$1 million – 15% of the incremental EBITDA
> $1 million-$2 million – 10% of the incremental EBITDA
> Over $2 million –To Be Determined
> Program runs through 12/31/2017 with re-evaluation at program end. Pro-rated for 2016

18.     Owens accepted the position with NAB and started work on May 1, 2016.

19.     During the course of Owens' employment with NAB he learned that the

compensation schedule which had induced him to accept the position was not attainable.

20.     Though Owens dedicated himself to providing the highest degree of work

commitment, work ethic and deliverables to NAB, *including but not limited to creating*

*approximately four times in more annual revenue during his tenure*, he was not provided

with the compensation which induced him to accept the position with NAB.

21.     Throughout Owen's tenure with NAB, he received numerous accolades based upon the performance of his department and projects for which he was responsible. Owens raised this compensation issue with NAB management on multiple occasions without explanation from NAB.  However, NAB continued to make misrepresentations to Owens.

22.     In August 2019, NAB finally agreed to increase Owens' base salary by $50,000 and also promised to change his bonus schedule to something that was actually attainable. During the course of this discussion, NAB and Gardner admitted the bonus schedule was false and not attainable.  However, Owens' new bonus schedule was never implemented. Owens ultimately determined that, given the intentional false inducements and continued misrepresentations by NAB, he could not continue to work the kind of hours he devoted to NAB without receiving the compensation he was promised.

23.     On November 1, 2019, Owens tendered his resignation with NAB.

24.     Due to ongoing work NAB still requested Owens to perform, which Owens did perform, Owens submitted a second resignation, by way of formal letter on January 4, 2020, thanking NAB for his experience and that he was willing to provide NAB with two additional months for a transition period so as not to disadvantage NAB.  However, NAB never responded to Owens' offer in this regard (or his second resignation), so Owens prepared to depart NAB two weeks after delivery of his second resignation.

25.     On January 10, 2020, at the request of Gardner, Owens met with Gardner and Kirk Haggarty, NAB's Chief Financial Officer, ("Haggarty") to discuss Owens' resignation and Gardner/NAB's desire that Owens stay on with NAB.

26.     On January 15, 2020, Owens sent an email to Gardner thanking him for the conversation and reiterated his desire to leave NAB.

27.     Owens had not heard from anyone at NAB regarding his offer to stay through the end of February, so he continued to prepare for his last date of employment on January 17, 2020.  On January 17, 2020, having not heard from anyone at NAB, Owens sought out Haggarty or Gardner to discern what he needed to do to turn in his badge, conduct an exit interview and anything else expect of an employee on their last day.  Haggarty advised Owens that Gardner thought Owens "was bluffing" when he tendered his resignation. Haggarty asked Owens to stay on until the end of February.

28.     On January 21, 2020, Haggarty sent Owens an email confirming that Owens should stay on until the end of February and that he should have another discussion with Gardner in person at NAB's corporate sponsored trip in Cabo San Lucas.

29.     Owens attended NAB's corporate trip to Cabo San Lucas to speak with Gardner, at Haggarty's request, but Gardner did not discuss Owens' departure or employment. Throughout the Cabos trip, top NAB executives drank alcohol and disclosed certain information concerning: (i) women within the company, (ii) those individuals who were not invited to Cabo, and (iii) ongoing various litigation against NAB.

30.     After the Cabo trip, in February 2020, Gardner requested that Owens meet him for drinks at Market in Birmingham, MI to which Owens agreed.  At that time, Owens advised Gardner that he was offered employment with SpotOn, a California company, which he was seriously considering accepting.  Gardner voiced no objection of any kind to Owens indicating he would likely accept the SpotOn offer and acknowledged that he would understand if Owens accepted the offer from SpotOn.  However, in another effort to keep Owens, Gardner made Owens an offer to stay on at NAB that included a "multiple of his salary" when NAB was sold which Gardner stated would likely be sometime in 2021.  Owens was never advised what exactly his "multiple of his salary" bonus would be and, given the track record of Defendants to not pay any bonus or variable compensation (despite their representations they would), Owens did not believe he would ever receive this "multiple of salary" bonus.

31.     A few days later, Owens sent Gardner an email thanking him for the offer but that staying on with NAB would not be the best decision for him or his family.  Owens wished Gardner well.  Owens received no response from Gardner.

32.     On March 4, 2020, Owens started employment with SpotOn.

33.     NAB and Gardner knew that Owens started employment with SpotOn in March 2020.

34.     NAB and Gardner never notified Owens that they thought Owens' employment with SpotOn violated any term or condition of his purported employment contract with NAB.

35.    Since Owens' departure from NAB, and PM continuing on as an agent for NAB,

Plaintiffs have:

(i) boarded eleven new merchants with NAB;

(ii) taken countless calls from NAB/CDITech to provide regular and significant

assistance on training, support, sales and answer frequent questions on various

matters and issues;

(iii) offered to pick up NAB/CDITech hardware and store it during the covid-19

health pandemic which has shut down many customers of NAB;

(iv) offered NAB/CDITech assistance on anything they needed during the

health pandemic;

(v) offered NAB/CDITech the ability to extend zero-cost online ordering

through 2020 with payment terms on the initial set up costs;

(vi) offered to assist in finalizing a new arrangement with NAB/CDITech and

SpotOn that would benefit both companies;

(vii) offered to hire employees directly responsible for installing and

supporting EmaginePOS so that NAB/CDITech could continue to sell their product

and the SpotOn team would handle installations and support on NAB/CDITech's

behalf;

(viii)  participated in lengthy conference calls with a merchant to set up an effective loyalty program for NAB/CDITech customers to drive sales up using loyalty and spent significant time with NAB/CDITech employees discussing same;

(ix) had SpotOn development team get on a call with NAB/CDITech and develop a custom report so that NAB/CDITech would not lose the 15th location of the JL Beers deal;

(x) spent countless hours launching a charitable program and gift card sales for multiple NAB/CDITech customers;

(xi) donated extensive time and money to deliver 200 pizzas a day, for three days, to feed the first responders at four local hospitals' emergency rooms during the coronavirus national health pandemic in an effort to help an NAB/CDITech customer create goodwill and drive sales; and

(xii) offered to work with SpotOn to suspend SpotOn payments for any merchants that were closed so that NAB/CDITech would not be billed for merchants who were not open (so long as NAB/CDITech extended that courtesy to the effected merchants).

36.    On April 21, 2020, Owens received an aggressive and threatening letter from NAB's in-house attorney Earl Johnson claiming that Owens had violated certain terms and conditions of his employment and agent contract with NAB.

37.     There were no facts provided by NAB to substantiate any of NAB's claims; and, after discussions with NAB's legal counsel it was clear that NAB failed to conduct any due diligence prior to making such claims.

38.     Because notice was never provided to Plaintiffs and this was the first time Plaintiffs had heard of any violation of any term of either the purported employment or agent contracts with NAB, and that such accusations came from NAB's attorney, Owens hired an attorney.  Owens also contacted Gardner directly in an effort to address any misinformation under which NAB was clearly operating so that whatever "perceived issue" by NAB could be addressed and resolved amicably.  However, Gardner refused to even respond to Owens and refused to schedule a meeting in an effort to resolve the matter.

39.     Moreover, rather than engage in any good faith attempt at resolution of NAB's sudden and unsubstantiated accusations, particularly after all of Owens' efforts to assist NAB during the national health pandemic, on May 16, 2020 Gardner and another NAB attorney, David Greenberg, contacted Owens' new employer SpotOn and threatened them that if SpotOn did not immediately terminate Owens, pursuant to an alleged noncompete, that NAB would sue SpotOn.

40.     The following morning on May 17, 2020, NAB persisted in their threats and intimidation against SpotOn and sent an email to SpotOn demanding and threatening to know what SpotOn was going to do about NAB's demand that SpotOn terminate Owens.

41.     SpotOn succumbed to NAB's threats that same day and notified Owens on May 17, 2020 that it was terminating Owens' employment.

42.     Owens was making $250,000.00 annually with SpotOn, plus significant benefits including, but not limited to, stocks, 6% employer matching of 401k, and health insurance for Owens, his wife and child(ren).

43.     Subsequent to NAB getting Owens fired from his new employment, NAB then unilaterally withheld Owens' residuals under his agent contract, by and through Plaintiff PM, ultimately denying Owens any income whatsoever[1].

44.     Rather than attempt any resolution, in good faith whatsoever, including on June 11, 2020 during a call between the parties respective legal counsel, Defendants instead persisted in their unlawful behavior and bad faith by reaching out to another entity with whom Owens does business to yet again tortiously interfere with Owens' business relationships and opportunities.  Furthermore, Greenberg, a New York attorney, after being made aware that Plaintiffs were represented by counsel, directly contacted Plaintiffs by letter.

---

[1] After withholding significant residual payments to Plaintiff PM, NAB has since provided some residual payments to Plaintiff but continues to engage in gamesmanship and deceitful behavior, taunting Plaintiff in a sick, disturbing scheme to deny him any income whatsoever during a national health pandemic.  However, NAB has never provided a rationale or detailed accounting for withholding of any residuals whatsoever.  Plaintiffs is suffering grave and irreparable harm as a result of Defendants intentional, malicious behavior to deny him any income whatsoever.  Plaintiffs seeks an emergency order from this Court directing NAB to pay all outstanding residuals within three days and to pay all future residuals timely pending adjudication of this matter.

**COUNT I**
<u>**Tortious Interference with a Contract or Business Relationship or Expectancy**</u>
<u>**As to All Defendants**</u>

45.     Plaintiffs reallege and incorporate the above paragraphs by reference as if fully set forth herein.

46.     Defendants knew of the contracts and business relationships and expectancies between Plaintiff Owens and SpotOn.

47.     By targeting, threatening, harassing and intimidating SpotOn, Defendants intentionally, improperly and maliciously interfered with the contracts and business relationships and expectancies between Plaintiff Owens and SpotOn.

48.     Defendants actions intended to, and did, interfere with Plaintiff Owens' contracts and business relationships and expectancies, causing SpotOn's breach, disruption or termination.

49.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Owens has suffered substantial and irreparable economic injury, loss of contracts, loss of business expectancies, loss of salary, loss of benefits, loss of stocks, loss of health insurance for Owens' and his family, harm to his business reputation, loss of esteem and standing in the community and loss of business opportunities.  Plaintiff Owens is also entitled to exemplary damages.

**COUNT II**
**Fraud and Fraudulent Inducement**
**As to Defendants NAB and Gardner**

50.     Plaintiffs reallege and incorporate the above paragraphs by reference as if fully set forth herein.

51.     Defendants made a material representation regarding the terms and conditions of Plaintiff Owens' offer of employment with NAB, including but not limited to, Plaintiff Owens' compensation.

52.     Plaintiff Owens compensation, specifically his compensation bonus scale, was false.

53.     Defendants knew it was false, or made it recklessly without knowledge of its truth.

54.     The representation was made with the intent that Plaintiff Owens' would act upon it, and Plaintiff Owens did act in reliance upon the representation, which caused Plaintiff Owens to suffer significant damages.

**COUNT III**
**Breach of Contract**
**As to Defendant NAB**

55.     Plaintiffs reallege and incorporate the above paragraphs by reference as if fully set forth herein.

56.     On or about June 12, 2017, Defendant NAB and Plaintiff PM entered into an Agent Agreement wherein Plaintiff PM would identify prospective merchants in an effort to sell such prospective merchants NAB credit card processing services.  (**Exh. B**, Agent Agreement.)

13

57.     The Agreement sets forth the compensation that Plaintiff PM is to receive for such services.

58.     Defendant NAB failed to compensate Plaintiff PM pursuant to the terms of said Agreement.

59.     Defendant NAB's breach was intentional and knowingly.

60.     Plaintiff PM has suffered, and continues to suffer, damages as a result of Defendant NAB's breach of contract.

## COUNT IV
## Civil Conspiracy
## As to All Defendants

61.     Plaintiffs reallege and incorporate the above and below paragraphs by reference as if fully set forth herein.

62.     At all relevant times herein, Gardner and Greenberg acted in concert with one another.

63.     At all relevant times herein, Gardner and Greenberg acted in concert with one another in order to accomplish an unlawful purpose of tortiously interfering with Owens' employment with SpotOn by threatening and intimidating SpotOn in order to get SpotOn to terminate Owens' employment.

64.     During the several months that Defendants knew Owens was working at SpotOn, Defendants never contacted Owens to notify him of their newfound contention that a purported noncompete was allegedly violated.

14

65.     At all relevant times herein, Gardner and Greenberg knew that the purported "noncompete" was unenforceable, invalid, void and/or waived by NAB.

66.     Defendants maliciously intended to, and did, cause harm to Owens and did so for an unlawful purpose, or, by unlawful means.

## COUNT V
## Defamation
## As to All Defendants

67.     Plaintiffs reallege and incorporate the above paragraphs by reference as if fully set forth herein.

68.     Defendants have, and continue to, intentionally make false and defamatory statements against Owens to third parties regarding (i) him allegedly violating a noncompete; and (ii) repeated negative comments about his work and work ethic which Defendants know to be false and defamatory.

69.     Owens has been severely and irreparably economically harmed by such defamation in his reputation by such false statements.

## COUNT VI
## Intentional Infliction of Emotional Distress
## As to All Defendants

70.     Plaintiffs reallege and incorporate the above paragraphs by reference as if fully set forth herein.

71.    Each Defendant's conduct, as outlined above, was intentional or reckless. The Defendants conduct as outlined above was extreme, outrageous, and beyond all possible bounds of decency, and have such character as to be intolerable in a civilized society.

72.    The Defendants' conduct as outlined above, was not for any proper purpose.

73.    The Defendants' conduct caused the severe and serious emotional distress of Owens.

74.    The Defendants' conduct in this matter, which proximately caused Owens' injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for the Owens' physical and emotional well-being.

75.    As a direct and proximate result of Defendants' conduct, Owens suffered, and continues to suffer, humiliation, mortification, overwhelming stress, embarrassment, sleeplessness, anxiety and other emotion and physical damage.

<u>**COUNT VII**</u>
<u>**Unfair Competition**</u>
<u>**Section 43(a) of the Lanham Act, 15 U.S.C. 1125**</u>
<u>**As to All Defendants**</u>

76.    Plaintiffs reallege and incorporate the above paragraphs by reference as if fully set forth herein.

77.    Defendants made a false, misleading and deceptive statement of fact concerning Plaintiff's noncompete, Plaintiff's business strategy and proprietary business skills and

acumen in an effort to obtain an unfair business advantage over Plaintiffs, and Plaintiff Owens' new employer SpotOn.

78.    Defendants' false and misleading statements have a tendency to mislead or deceive people.

79.    Defendants' statements are material in that such statements will likely influence the deceived person's business decisions.

WHEREFORE, Plaintiff prays that this Court, after a trial by jury, enter an award in his favor and against the Defendants for actual, compensatory, consequential, incidental and exemplary damages as a result of Defendants' unlawful and malicious conduct as identified in each of the aforementioned causes of action, as well as all other remedies and damages as authorized by law, including but not limited to, attorney fees and costs.

Respectfully Submitted,

/s/ *Natalie C. Qandah*
 Natalie C. Qandah (P58434)
Vida Law Group, PLLC
Attorneys for Plaintiffs
43050 Ford Rd., Suite 160
Canton, MI 48187
PH: (734) 456-9004
natalie@vidalawpllc.com

Verified by Duane Owens'
and Partners Matters LLC:

*/s/ Duane Owens*

Dated: July 16, 2020

17

**JURY DEMAND**

Plaintiff hereby respectfully demands a trial by jury on all claims and issues so triable.

Respectfully Submitted,

/s/ *Natalie C. Qandah*
Natalie C. Qandah (P58434)
Vida Law Group, PLLC
Attorneys for Plaintiffs
43050 Ford Rd., Suite 160
Canton, MI 48187
PH: (734) 456-9004
natalie@vidalawpllc.com

Dated: July 16, 2020

**EXHIBIT A**



Powering the Hospitality Industry

March 28, 2016

Duane Owens


Re: <u>Offer of Employment</u>


Dear Duane,

Congratulations! On behalf of CDI Tech, a wholly owned subsidiary of North American Bancard, LLC ("NAB"), we are very pleased to confirm our offer of employment to you.

Below is a summary of your offer of employment for the General Manager position with a start date to be determined. In this regular full-time position, you will report to Kirk Haggarty, NAB Chief Financial Officer.

If you accept this offer of employment, you will receive the following:
- An annual salary of $125,000 to be paid biweekly, in accordance with the Company's payroll practices.
- You will be eligible to participate in the Incentive Plan as outlined below:
  <u>Base Level EBITDA</u> - $350,000
  $350,000-$1 million – 15% of the incremental EBITDA
  $1 million-$2 million – 10% of the incremental EBITDA
  Over $2 million –To Be Determined
  Program runs through 12/31/2017 with re-evaluation at program end.
  Pro-rated for 2016
  Must be in the position and in good standing to be eligible for incentive plan.

- Eligible to join the NAB Benefit Plan the first of the month after 30 days of employment.
- Eligible for participation in the Company's 401(k) Savings Plan the first of the month after 30 days of employment, in accordance with the terms and conditions of the plan. Please note that you will be automatically enrolled in the Company 401(k) Savings Plan at 3% of your earnings, effective on your eligibility date unless you decline participation.
- Eligible for Company designated holidays in accordance with the terms of our holiday policy.
- Eligible for 1 Floating Holiday.
- Eligible for 3 paid Sick/Personal Days, which are pro-rated based on hire date.
- After 90 days of employment, eligible for 160 hours of paid vacation annually to be accrued per pay period.

A more comprehensive explanation of your benefits plan will be presented to you during your onboarding process.

Your offer of employment is contingent upon your signing and agreeing to and/or complying with each of the following:

- Employee Non-Disclosure and Non-Solicitation Agreement
- Employee Information Form
- Employee Handbook
- Proof of Identity and Employment Eligibility (I-9 Documentation)
- Background Check and Drug Screening – your acceptance of this position is with the understanding that the final appointment is contingent upon the successful completion of the background investigation and drug screening process. Unsatisfactory results may result in withdrawal of the employment offer.

<u>Employment At Will</u>: While I have every expectation that you will have a successful career with us, I must remind you that your employment with the Company is on an "at will" basis, which means that either of us may choose to terminate your employment at any time, with or without cause, with or without notice and without compensation except for time worked.  Accordingly, nothing in this offer letter should be construed as creating a contract of

employment, or employment for a specified term.  Please note that all compensation, benefits and other terms of employment are subject to change from time to time, as the Company determines.

**If you find our offer to be acceptable, please sign this letter and return both pages along with your signed new hire paperwork to <u>newhire.recruiting@nabancard.com</u> or fax to 248.283.6104 by Tuesday, April 5, 2016, or the offer will be deemed withdrawn.** Please retain a copy of the offer letter for your records.

We look forward to your accepting this offer, and in the meantime, should you have any questions or concerns regarding this Offer of Employment, please contact my office.

Sincerely,

Kirk Haggarty, NAB Chief Financial Officer
248-269-6000 Ext 1913
khaggarty@nabancard.com

cc: Ron Kasnow, Julia Kellogg


_____
Duane Owens                                                    Date

**EXHIBIT B**

Agent ID: 33893

Agent Name: Partners Matters, LLC

Regional Manager:

National Agent Recruiter: Marc Moran

Date Recieved:

☐ Agent Agreement    ☐ ACH Auth Form    ☐ Voided Check
☐ Background Form     ☐ W9              ☐ Agent Profile
☐ Website Compliance  ☐ Code of Ethics  ☐ Compensation Plan
☐ Activation Bonus    ☐ Approval Bonus  ☑ Docusign Package

Date Approved:

File Scan Date:

Comments:

Also 32054

6/14/17
Approved
(WG)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

## Sales Partner Profile & Questionnaire

| Business Information | | |
|---|---|---|
| **Business Name** <br> Partners Matters, LLC | **Business Mailing Address** *(if different from location address)* <br> 1641 S Milford Rd, Suite A-104 | |
| **Physical Location Address** <br> 1641 S Milford Rd, Suite A-104 | Highland     MI     48357 | |
| **City, State, Zip** <br> Highland     MI     48357 | **Phone #** <br> 2485046100 | **Fax#** <br> 2485046101 |
| **Email Address** admin@partnersmatter.com | **Website Address (URL)** www.partnersmatter.com | |
| **Bank Name** <br> PNC | **Type of Account**  ☒ Checking   ☐ Savings | |
| **Checking Account #** <br> 4114514489 | **Bank Routing #** <br> 041000124 | |

| Owners Information | |
|---|---|
| **Name of Principal** <br> Duane     Owens | **Name of Principal** |
| **Residence Address** <br> 1610 Orban | **Residence Address** |
| **City, State, Zip** <br> Milford     MI     48380 | **City, State, Zip** |
| **Home Phone #** <br> 7343412819 | **Home Phone #** |
| **Mobile Phone #** <br> 7343412819 | **Mobile Phone #** |
| **Date of Birth** <br> 10/15/1974 | **Date of Birth** |
| **SS#** <br> 374909133 | **SS#** |
| **Driver's License #** <br> O520155441792    **State of Issue** mi | **Driver's License #**    **State of Issue** |

| Other Information | |
|---|---|
| **Last Employer Name** <br> NAB-CDI | **Position** <br> General manager |
| **Have you previously sold merchant service?** ☒ Yes  ☐ No <br> Yes | **Years in Industry** <br> 5+ |

**If YES, please provide the name of the company you sold for**
NAB-CDI

| Projected # of Merchant applications per month | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 |
|---|---|---|---|---|---|---|
| | 3 | 3 | 3 | 3 | 3 | 3 |

| **Have you previously sold cash advance?** <br> Yes | **If NO, would you like us to sell cash advance to merchants on your behalf?** |
|---|---|

**Would you like us to provide your business contact information if merchant is requesting:**

| | | Yes | No |
|---|---|---|---|
| Additional Equipment: | | ☒ Yes | ☐ No |
| Additional MID # (s): | | ☒ Yes | ☐ No |
| Major changes that require new MID# (s): | | ☒ Yes | ☐ No |
| Pricing Review Requests | | ☒ Yes | ☐ No |
| Misc. questions and/or merchant is requesting your contact info: | | ☒ Yes | ☐ No |

*(If this section is not completed, no contact information will be released to the merchant)*

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

| Form **W-9**<br>(Rev. December 2011)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | **Give Form to the**<br>**requester. Do not**<br>**send to the IRS.** |
|---|---|---|

Name (as shown on your income tax return)

**Partners Matters, LLC**

Business name/disregarded entity name, if different from above

**Partners Matters, LLC**

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor   ☐ C Corporation   ☐ S Corporation   ☑ Partnership   ☐ Trust/estate

**LLC - S-corp**

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ -------------------

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

**1641 S Milford Rd, Suite A-104**

Requester's name and address (optional)

City, state, and ZIP code

**Highland    MI        48357**

List account number(s) here (optional)

## Part I — Taxpayer Identification Number (TIN) — ETIN

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

6 1 1 7 9 6 4 8 4

## Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

| Sign<br>Here | Signature of<br>U.S. person ▶ *Duane J Owens* | Date ▶ 6/12/2017 |
|---|---|---|

8AB70E01A872473...

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued), or

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X                    Form **W-9** (Rev. 12-2011)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

## North American Bancard, LLC Agent Agreement

North American Bancard, LLC, a Delaware limited liability company ("NAB") whose business is located at 250 Stephenson Hwy Road, Troy, Michigan 48083 is entering into this Agent Agreement ("Agreement") as of _____6/12/2017_____ ("Effective Date"), with _Partners Matters, LLC_____ ("Agent") whose primary business is located at __1641 S Milford Rd, Suite A-104_____

| Highland | MI | 48357 |

## Recitals

A.  Agent engages in the business of marketing services to business entities that accept Cards (as defined below) as payment for goods and services; and

B.  NAB provides Merchant Card Services (defined below), to merchants through bank(s) that are members of the Visa and MasterCard and NAB wishes to retain Agent to assist in marketing its Merchant Card Services.

C.  Therefore, in consideration of the mutual promises and the terms and conditions below, the parties agree as follows.

## SECTION 1 - DEFINITIONS

1.0      Except as otherwise indicated, and unless the context otherwise clearly requires, the following terms shall have the following meanings in this Agreement.

(a)      "Card" means (i) a valid credit or debit card in the form issued under license from a Card Association or (ii) any other valid credit card, charge card or debit card accepted by Merchant with NAB's prior written approval.

(b)      "Card Association" means Visa U.S.A., Inc., Visa International, Inc., MasterCard International, Inc. or any other card issuers, such as debit networks, that provide Cards that are accepted by Merchant by agreement with NAB.

(c)      "Cardholder" means the person whose name is embossed upon the face of the Card.

(d)      "Gross Sales" means the total value of card sales generated by an individual Merchant, for any stated time period, and presented to a Member Bank for processing and collection.

(e)      "Member Bank" means any member of a Card Association that has registered NAB as its agent to provide Merchant Card Services.

(f)      "Merchant" means each party solicited by Agent and with which NAB and a Member Bank enter into a Merchant Agreement as a result of such solicitation.

(g)      "Merchant Account" means a specific and unique numbered account established by NAB for the processing of a Merchant's Card Transactions.

(h)      "Merchant Agreement" means any agreement in effect by and among NAB, a Member Bank and a Merchant, and shall include any application required by NAB to determine if a business will be accepted as a Merchant.

(i)      "Merchant Card Service" means the operations relating to the acceptance, processing and collection of Transactions on behalf of Merchants by NAB. Such operations include, but are not limited to solicitation of prospective Merchants, credit review and approval of Merchants, clearing and settlement of Transactions, customer services, and chargeback and retrieval services.

(j)      "Merchant Program" means the operations, policies and procedures as established by a Member Bank for NAB for the processing and settlement of Card Transactions for Merchants.

(k)      "Merchant Program Standards" means the written policies and procedures established from time to time by Member Bank and NAB to govern the operations of the Merchant Program, including credit and standards to be used by Agent in the solicitation of prospective merchants and policies and procedures to ensure that relationships with Merchants are satisfactory and that the Merchant Program is maintained in a financially safe and sound manner.

1

Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

(l)      "Rules" means the rules and regulations of the Card Associations, as they may exist from time to time, and the rules and regulations of any debit network or federal or state department or agency having jurisdiction over the activities of a Member Bank, NAB or Agent.

(m)      "Sales Person" or "Sales Persons" means those individuals that have been identified by Agent and are managed by Agent to solicit and sign Merchants for NAB under the terms of this Agreement.

(n)      "Transaction" means any sale of goods or services, or credit for such, from a Merchant for which the customer makes payment through the use of any Card and which is presented to a Member Bank for collection.

## SECTION II- MERCHANT PROGRAM MARKETING

2.1      Marketing Duties of Agent. Agent shall identify prospective Merchants that Agent believes will meet Merchant Program Standards. Agent will obtain all information and documentation required by Merchant Program Standards and any other information and documentation that the Member Bank or NAB may reasonably require.

2.2      Merchant Program Standards. Agent shall faithfully and consistently apply Merchant Program Standards to all prospective Merchants and Merchant Agreements. Agent acknowledges that NAB or its Member Bank may at any time amend such standards to ensure the financial safety and soundness of the Merchant Program. Agent will accept and abide by all such amendments.

2.3      Use of Merchant Agreements. Agent shall use only the form of Merchant Agreement that has been approved by NAB for Agent's use with the Merchant Program. Agent shall not make any changes or modifications to any Merchant Agreement without the prior written consent of NAB. NAB reserves the right to amend or change in any manner the Merchant Agreement to be used by Agent, including changes to the discount rate, Transaction fees and all other fees due from Merchants.

2.4      Approval of Merchant Agreements. Agent acknowledges that all Merchant Agreements must be approved by NAB and/or Member Bank, at their sole discretion, and will become effective only upon such approval. Therefore, Agent will not make any promise to or create any impression with a prospective Merchant that its Merchant Agreement will be approved prior to Member Bank's review and approval. Further, Agent acknowledges that all aspects of the Merchant Program are subject to the management and approval of NAB and/or Member Bank, and Agent shall make no representations to the contrary.

2.5      Acceptable Merchants. Agent shall market the Merchant Program only to bona fide and lawful businesses and in accordance with the Merchant Program Standards. Agent shall promptly notify NAB in writing of any adverse information that Agent receives relating to a Merchant, including but not limited to information regarding a Merchant's financial condition, use of Cards for any purpose other than payment for the bona fide sale of goods and services, changes in Merchant's method of doing business or types of goods or services, or information that would have a material effect on Merchant's ability to conform to the terms of its Merchant Agreement.

2.6      Supplies and Merchant Training. Agent shall instruct Merchant to contact NAB in sufficient time to order necessary supplies. Agent shall provide proper training on the use of processing equipment and the proper operational procedures for acceptance of credit and/or debit cards according to Association Rules. The foregoing may include placement of manual imprinters for all Merchants, use of NAB approved manuals and written procedures and training related to the use of electronic point-of-sale terminals.

2.7      Sales and Marketing.

(a)      Marketing Materials. Agent shall use only those marketing and promotional materials that have received NAB's prior written approval. Only a registered Independent Contractor that has a direct written contract with Visa or MasterCard may perform services on behalf of the Member. An Independent Sales Organization, Third-party Service, or Independent Contractor must not present itself to prospective merchants under any other trade name except the one registered with Visa or MasterCard. If agent is not a registered ISO or MSP, they must market processing services under the North American Bancard, LLC brand. If agent's business is not registered with Visa as an Independent Sales Organization or with Mastercard as a Member Service Provider, agent is not authorized to represent that they sell Visa and/or MasterCard processing services, which includes but is not limited to the use of the Visa and/or MasterCard logos or the Brand Visa and/or MasterCard. Agent shall not use any Card Association trademark on business cards, letterhead or stationery. When soliciting Merchants on behalf of NAB,

2

Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

Agent may not present itself to prospective Merchants under any trade name other than "North American Bancard, LLC."

(b) *Sales Agent Compliance.* Agent agrees to follow and abide by the Sales Partner Compliance Guide which is incorporated into and made part of this Agreement, and to be bound by the operating regulations and rules of Visa, MasterCard, Discover and any other card association or network organization covered by this Agreement, as any of the above referenced documents may be modified and amended from time to time. Agent acknowledges that the Sales Partner Compliance Guide is located on NAB's website at the following link:
https://www.agentinfocenter.com/c107_files/downloads/news/agent_compliance_and_code_of_ethics.pdf.

2.8   Sales Persons. Agent shall be responsible for identifying and employing Sales Persons who will solicit Merchants and otherwise market the Merchant Program. Agent shall be liable for the actions of all Sales Persons. All Sales Persons must be approved by NAB. Agent will immediately notify NAB of the termination of any Sales Person.

2.9   Site Surveys. Upon NAB's demand, Agent or Sales Person shall perform an on-site inspection of a Merchant's place of business. This site inspection may include a picture of the facade of the business establishment demonstrating Merchant's d/b/a name and a picture of the inside of the business premises, preferably showing Merchant's inventory. Agent authorizes NAB to conduct site surveys of their business/personal address as indicated per the ISO documentation.

2.10   Sub-Contracting of Services. Agent shall not enter into any contract, whether written or oral, with any other organization or entity (other than with Sales Persons performing services on behalf of NAB) to market the Merchant Program without NAB's prior written consent. Each such entity approved by NAB must enter into a separate written agreement with NAB.

2.11   Losses. All losses incurred by NAB attributable to Merchants, including but not limited to fraud, chargebacks and non-payment of Merchant fees, will be borne by NAB. ISO will be liable to NAB for all losses, fines, fees and expenses arising out of Agent's or Sales Person fraud, negligence, or failure to comply with the terms of this Agreement.

## SECTION III- EXPENSES AND COMPENSATION

3.1   Expenses. Agent shall be responsible for payment of all expenses relating to its performance of this Agreement, and, except as set forth in Section 3.2, NAB shall have no obligation whatsoever to reimburse Agent for any expenses incurred by Agent in connection with this Agreement. Further, Agent shall be solely responsible for determining whether payment will be made for expenses of any Sales Person and shall be solely liable for any such payment.

3.2   Review of Documents. NAB shall be responsible for expenses and legal fees incurred by NAB in connection with its initial review of all agreements, marketing materials and other documentation relating to the Merchant Program that are proposed by Agent. Any expenses and legal fees relating to the review of changes to such documents or new documents proposed or used by Agent shall be paid by Agent. In addition, Agent shall pay all legal fees and expenses incurred by NAB relating to the renegotiations of any term or condition of this Agreement or any renewal of this Agreement, if such renewal involves material changes to the Agreement.

3.3   Compensation. During the term of this Agreement, compensation to Agent will be paid as set forth in the attached Exhibit A, Revenue Share Program ("Compensation"). Compensation calculated for a month's transactions shall be paid within thirty days (30) after receipt thereof by NAB. At the time of each payment, or soon thereafter, NAB will provide a statement detailing the computations used by NAB in arriving at the compensation. If Agent disputes any Compensation paid to it, Agent agrees to inform NAB within 30 days of the date of payment. Agent waives any claim against NAB regarding any Compensation Agent fails to dispute within such 30-day period. Notwithstanding anything to the contrary in this Agreement, Agent shall have no right or claim to receive Compensation for, or to share in, revenues generated by any products or services now or in the future sold by or through NAB, except to the extent that such products, services and accompanying revenues are expressly incorporated as a component in determining Compensation in Exhibit A. Compensation will terminate immediately upon termination of this Agreement by NAB for cause. Agent acknowledges that the fees charged to merchants and Agent by NAB are subject to change. Residual payments for accounts on reserve will be settled to the agent at 50% of the contracted residual rate. NAB will settle the reduced residual amount until such time as the reserve balance is released to the merchant.

3

Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

(a)   Compensation to Sales Persons. Agent shall determine reasonable compensation to be provided to Sales Persons employed in marketing Merchant Card Services for NAB, and Agent shall be responsible for providing such compensation to each Sales Person from revenues paid to Agent under this Agreement.

(b)   Term of Compensation. NAB shall have the right to terminate compensation to Agent if Agent is not actively soliciting and establishing new Merchant Accounts for a period of 6 months, and total residual compensation is less than or equal to $50.00. Agent must submit a minimum of 3 approved Merchant Accounts during this 6-month period to be considered as actively soliciting merchant accounts to continue to receive $50.00 or less residual compensation.

(c)   Payments and ACH Authorization. Agent hereby authorizes NAB, solely with respect to amounts due pursuant to this Agreement, to initiate Automated Clearing House ("ACH") Authorizations to debit and/or credit entries to charge and/or credit Agent's demand deposit account on file with NAB, and hereby authorize and direct the financial institution to debit the account in the amount of each debit, and, if necessary initiate any adjustments for any transactions credited/debited in error  Agent agrees that: Agent will notify NAB in writing of any changes in its demand deposit account information on file with NAB; NAB shall incur no liability if balance in the account is insufficient to cover any draft upon presentation; canceled draft/bank debit memo account statement will constitute a receipt for the payment of the specified amount; NAB may, at its discretion, attempt to re-debit drafts returned unpaid a reasonable number of times. This authorization shall remain in effect unless and until NAB has received written notification from Agent that this authorization has been terminated in such a time and manner to allow NAB and the applicable financial institutions to act. Undersigned represents and warrants to NAB that the person executing this Agreement is an authorized signatory on the bank account referenced above. Agent further agrees that a breach of this authorization section will constitute a "Breach" of this Agreement.

3.4   Setoff Rights, Security Interests. NAB shall have the right to setoff any amounts owed by Agent under this Agreement against any funds credited to or owing to Agent. NAB may exercise this right of setoff at any time and without notice to Agent whether or not the obligations of Agent to NAB are then due. As security for the obligations of Agent to NAB, Agent hereby grants NAB a security interest in all money, instruments and other property of Agent that may now or hereafter be held by NAB or the Member Bank.

3.5   Sale or Merger of NAB. NAB may at any time sell or merge its business or its Merchant portfolio. In the event NAB chooses to exercise this option, if Agent is in good standing it may, at NAB's option, either continue to be paid compensation by the successor company or it will be paid a one-time buy out to be negotiated at the time of the buyout.

## SECTION IV - ADDITIONAL OBLIGATIONS

4.1   Compliance with policies and procedures. Agent agrees to comply with NAB and the Member Bank's policies and procedures and with Rules. Agent agrees that NAB, Member Bank, the Card Associations and any federal or state regulatory agency having jurisdiction over Member Bank or NAB may, from time to time, amend their Rules, policies and procedures. Agent agrees to accept and abide by all such amendments within 10 days after receipt of such revisions (or immediately if amendments to Rules require immediate compliance).

4.2   Code of Ethics. Agent, on behalf of itself and all of its Sales Persons, managers, owners, employees and affiliates (collectively the "Agent Parties") acknowledges and agrees to comply with the following code of ethical conduct, and furthermore hereby agree to indemnify and hold NAB harmless from any damages, liability, or expenses for any violations of this Paragraph 4.2 by Agent or any Agent Parties:

(a) Agent will not make false promises or claims that are not indicated on the applicable Merchant Agreement;

(b) Agent will not make promises of payment for prior lease obligations or fee obligations for previous processing obligations in order to induce the applicant to sign a Merchant Agreement or any other agreement, unless those payments are actually made on the merchant's behalf;

(c) Agent will always provide merchants with all pages of the Merchant Agreement upon receipt of their signature;

(d) All fees will be disclosed to the merchant prior to obtaining signature;

(e) Agent will not have the merchant sign any pages of any agreement that have not been completely filled out;

4

Initial(s)

(f) Agent will not submit any Merchant Agreements to North American Bancard that have been altered after the merchant has executed the same, without written authorization from the merchant;

(g) Agent will abide by all Federal, State and Local laws, the Rules, regulatory agencies, and Member Bank and NAB policies and procedures;

(h) Agent will not accept monies from any merchant for services that Agent has not invoiced or provided; and

(i) Agent will not initiate any transactions in a merchant's credit card equipment other than test transactions.

4.3     Credit reporting/Criminal Background Checks on Agent. Agent authorizes NAB to investigate individual credit bureau and criminal background reports on each of Agent's principals and Sales Persons which shall include any persons individually or collectively directly or indirectly owning 10% or more of Agent, any officer or director of Agent, and any person actively participating in the control of Agent's business.

4.4     Merchant Funds. Agent acknowledges that all funds to be paid to or by Merchants shall be under the sole control of NAB and Member Bank. Agent agrees that if any such funds are sent to Agent or any Sales Person, Agent shall be deemed to have received such funds in trust for the benefit of NAB and shall immediately remit such funds directly to NAB.

4.5     Audits. If NAB reasonably believes that Agent or any Sales Person is not materially performing its obligations under this Agreement, NAB or its designee may (a) conduct an audit of Agent's operations and books and records; (b) retrieve an additional periodic individual credit bureau report regarding Agent and related entities as listed in section 4.3 or (c) conduct performance audits of Agent to determine Agent's compliance with this Agreement, NAB's and Member Bank's policies and procedures, and Rules. All costs relating to any such audit shall be the responsibility of Agent if any material irregularities or non-compliance are identified by NAB. If NAB determines that no such irregularities or non-compliance exist, NAB shall bear costs of the audit.

## SECTION V - REPRESENTATIONS AND WARRANTIES OF AGENT

5.1     Agent represents and warrants to NAB as follows:

(a)     Agent has the full power and authority to execute, deliver and perform this Agreement. This Agreement is valid, binding and enforceable against Agent in accordance with its terms and no provision requiring Agent's performance is in conflict with Agent's obligations under any other agreement to which Agent is a party or by which it is bound.

(b)     If other than a sole proprietorship, Agent is duly organized, authorized and in good standing under the laws of the state of its organization and is duly authorized to do business in each other state in which Agent's business, including marketing of the Merchant Program, make such authorization required.

(c)     Neither Agent or any principal (as set forth in Sec. 4.2) has been subject to any (i) criminal conviction (excluding traffic misdemeanors or petty offenses), (ii) bankruptcy filings; (iii) Internal Revenue Service liens; (iv) federal or state regulatory administrative or enforcement proceedings; or (v) restraining order, decree, injunction or judgment in any proceeding or lawsuit alleging fraud or deceptive practices.

5.2     In the event Agent or any principal (as set forth in Section 4.2) is a party to or named in any pending lawsuits, Agent shall provide NAB with a list of the same at the time of Agent's execution of this Agreement. Further, Agent shall promptly notify NAB (within 30 days) of any litigation to which it or any such principal becomes a party or in which they may be named during any time in which this Agreement is in effect.

## SECTION VI- NON-SOLICITATION; CONFIDENTIALITY

6.1     Non-Solicitation of Merchants. Without NAB's prior written consent, Agent shall not cause or permit any of its employees, agents, principals, affiliates, subsidiaries, Sales Persons or any other person or entity (a) to solicit or provide services to any Merchant; (b) to solicit or otherwise cause any Merchant to terminate its participation in the Merchant Program; or (c) to solicit or market services to any merchant that is already directly or indirectly provided Merchant Card Services by NAB, whether or not such are provided under the terms of this Agreement. This Section 6.1 shall survive for a period of 5 years following any termination of this Agreement.



Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

6.2     Confidential Information.  Agent and NAB each agree that it will not use for its own purposes, will not disclose to any third party, and will retain in strictest confidence all information and data belonging to or relating to the business of the other (including without limitation the terms of this Agreement), and that each party will safeguard such information and data by using the same degree of care and discretion that it uses to protect its own confidential information.  All information relating to Merchants is the confidential Information of NAB.  No party will be obligated to maintain the confidentiality of information: i) it is required to reveal in performing its obligations under this Agreement or under a third party contract, ii) that is or becomes within the public domain through no act of the disclosing party in breach of this Agreement, iii) was in the possession of the disclosing party prior to its disclosure under this Agreement, and the disclosing party can prove that, iv) received from another source that has no restriction on use or disclosure, or v) is required to be disclosed by state or federal law.

6.3     Remedy.  In the event of a breach of this section, the parties agree that the non-breaching party will suffer irreparable harm, and that the amount of monetary damages would be impossible to calculate.  Thus, the non-breaching party will be entitled to injunctive relief in addition to any other rights to which the non-breaching party may be entitled, without the necessity of proof of actual damages.

6.4     Names and Trademarks. Neither party will use the other's name or trademarks in any promotional or marketing materials without prior written consent.  NAB grants to Agent a limited, non-exclusive license to use the name "North American Bancard, LLC" and to use the NAB trademark when conducting business on behalf of NAB under this Agreement. Until and unless Agent is registered as an MSP and Agent with the Card Associations, all telephone lines must be answered "North American Bancard, LLC" and Agent shall identify himself in correspondence with Merchants as NAB.  The parties understand and agree that this Agreement does not confer, and neither party shall obtain, any other right to either party's name or trademarks by virtue of such use.

## SECTION VII- TERM AND TERMINATION

7.1     Term. The initial term of this Agreement shall be for a period of 3 years, commencing on the Effective Date. This Agreement shall be automatically renewed for additional terms of 1 year each unless either party notifies the other no later than 30 days prior to the end of the current term that it does not wish to renew this Agreement.

7.2     Termination. This Agreement may be terminated at any time as follows:

        (a)     Either party may terminate this Agreement if the other party breaches any of the provisions of this Agreement and fails to cure such breach within 30 days of its receipt of written notice thereof; or

        (b)     Either party may terminate this Agreement if the other party (i) becomes insolvent; (ii) fails to pay its debts or perform its obligations in the ordinary course of business as they mature; (iii) becomes the subject of any voluntary or involuntary proceeding in bankruptcy, liquidation, dissolution, receivership, attachment or composition for the benefit of creditors; or

        (c)     NAB may terminate this Agreement if Agent materially defaults in its obligation to comply with the Rules, or if Agent or any Sales Person engages in fraud or misrepresentation to NAB or to any Merchant.

7.3     Regulatory Demand. If Visa, MasterCard or any federal or state regulatory agency having jurisdiction over the subject matter of this Agreement makes a demand that either NAB or Member Bank discontinue or substantially modify the Merchant Program, either party in its sole discretion may terminate this Agreement upon written notice to the other, in which case neither party shall be deemed to be in default by reason of such termination. Agent shall be entitled to continue to receive compensation as provided in Section 3.3 unless prohibited by the entity making the demand for discontinuance or modification.

## SECTION VIII- EFFECT OF TERMINATION

8.1     Compensation to Agent Following Termination. Unless this Agreement is terminated for a material, uncured default of Agent as set forth in Section 7.2, NAB agrees to make payments to Agent as set forth in Section 3.3 for any Merchant for as long as such Merchant remains with the Merchant Program.

8.2     Termination of Compensation.  If Agent violates any material term of this Agreement, including but not limited to Section 6.1 relating to the solicitation and marketing of services to Merchants following termination of this Agreement, NAB shall have no further obligations for payment of compensation as set forth in Section 8.1. If Section 6.1 is violated, Agent shall, upon demand by NAB, be required to pay damages to NAB in an amount equal to the

6

Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

revenue that NAB would have received from Merchants solicited in violation of this Agreement. NAB's rights under this section shall be in addition to all other rights granted to NAB under this Agreement or otherwise available at law or in equity.

8.3     Confidential Information.  Records prepared by Agent or that come into its possession during its service to NAB are and remain the property of NAB, and when this Agreement terminates, such records and any copies or summaries must be immediately sent to NAB. Agent will forward to NAB all information, products and documentation relating to NAB and its customers, which Agent acquires or develops during the term of this Agreement. Agent may not disclose such information to any person during or after the term of this Agreement.

## SECTION IX - ADDITIONAL TERMS AND CONDITIONS

9.1     Sale or Assignment of Agents Interest in Merchant Relationship and Right of First Refusal.  All right, title and interest in all Merchant Agreements is vested in NAB. Notwithstanding the previous sentence, NAB agrees that Agent may sell its right to receive Compensation, subject to the following:

(a)     The Agent agrees that if the Agent receives a bona fide offer to purchase some or all of the Agent's interest in the Compensation which the Agent desires to accept, Agent will notify NAB of the terms of such offer in writing. NAB is hereby granted the right of first refusal to purchase Agent's rights to Compensation at a price and on such terms equal to the offer. NAB may exercise its right of first refusal by giving written notice of such election to the Agent within 21 days of NAB's receipt of the notice. If NAB does not exercise its option within such period, the right of first refusal shall terminate with respect to that specific offer only. NAB agrees to purchase the Compensation on such terms within 30 days thereafter. Any materially different offer or proposal must be offered first to NAB.

(b)     Regardless of whether NAB chooses to exercise its right of first refusal, NAB shall be entitled to continue processing for all Merchants for the balance of the term of this Agreement, and any agreement to sell the Agent's rights in such Merchants must so stipulate.

(c)     NAB shall be named as a party to any such agreement to sell Agent's interest in the Compensation.

(d)     If this Agreement has not expired, purchaser must agree to enter into an agreement containing substantially the same terms as provided herein with respect to the Merchant Agreements for which Compensation is sold and assigned by the Agent to such purchaser.

(e)     In the event of such sale, the terms of this Agreement shall continue between the Agent and NAB as to any remaining or future Merchant Accounts. Agent shall not be relieved of any obligations under this Agreement until its expiration.

9.2     Indemnification.

(a)     Agent agrees to indemnify, defend, and hold harmless NAB, its employees, agents and Member Banks from and against any loss, liability, damage, penalty or expense (including attorneys' fees and cost of defense) they may suffer or incur as a result of (i) any failure by Agent or any employee, Sales Person, or agent of Agent to comply with the terms of this Agreement; (ii) any warranty or representation made by Agent to NAB being false or misleading; or (iii) any representation or warranty made by Agent or any employee or agent of Agent to any third person other than as specifically authorized by this Agreement.

(b)     NAB agrees to indemnify, defend and hold harmless Agent, its employees and agents from and against any loss, liability, damage, penalty or expense (including attorneys' fees and cost of defense) they may suffer or incur as a result of any failure by NAB or any employee or designated agent to comply with the terms of this Agreement. NAB shall have no liability to provide indemnification hereunder to the extent any loss, liability, damage, penalty or expense (including attorneys' fees and cost of defense) is caused or contributed to by Agent or any employee or agent of Agent.

(c)     Each party shall promptly notify the other of any claim or threat of claim of which such party becomes aware and that may give rise to a request for indemnification under this section 9.3.

9.3     Limitation of Liability and Damages.  In no event shall NAB be liable for any special, incidental, consequential or punitive damages of any nature or for any reason, regardless of the form of action, whether in contract,

Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

tort, or otherwise, even if the other party is advised of that possibility. The total cumulative liability of NAB in the aggregate for damages arising from any breach of this Agreement shall not exceed an amount equal to the lesser of: (a) fees derived by NAB under this Agreement if the Agreement has been in effect for less than 4 months, or (b) fees derived by NAB under this Agreement during the most recent 4 month period, measured from the date the liability accrues. The parties agree that the previous sentence shall not apply to a breach by NAB of NAB's responsibility to pay Agent Compensation under this Agreement. Neither party will be liable to the other for any failure or delay in its performance of this Agreement if such failure or delay arises out of causes beyond the control and without the fault or negligence of such party.

9.4    Injunctive Relief; Specific Performance. Each party agrees that in the event of any action by the other party that in the non-breaching party's reasonable judgment will create an actual or threatened breach of this Agreement, the non-breaching party's remedies shall include specific performance or injunctive relief, or both, in addition to any and all remedies at law or in equity and all such rights shall be cumulative.

9.5    Relationship of Parties. NAB intends no contract of employment, express or implied, with either Agent or Sales Persons, and Agent shall make no representations to the contrary. Agent shall be deemed an independent contractor of NAB for all purposes. Without limitation, neither Agent nor any Sales Person has obtained any right to compensation or any other benefits of an employee by way of this Agreement, except for payment of any sales incentives NAB may offer Agent or Sales Persons for the sole purpose of obtaining Merchants for the Merchant Program.

9.6    Waiver. No provision of this Agreement shall be deemed waived and no breach excused, unless such waiver or consent is in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other party, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any different or subsequent breach.

9.7    Assignment. Neither party shall assign, delegate, subcontract, license, franchise, or in any manner attempt to extend to any third party any right or obligation under this Agreement without the prior written consent of the other party; provided, however, NAB may assign this Agreement and its rights hereunder to a purchaser of all or substantially all or part of the Merchant Program.

9.8    Amendments. NAB may amend this Agreement with 3 days written notice provided to Agent.

9.9    Notices. All notices and other communication required or permitted under this Agreement shall be in writing and given by personal delivery, telecopy (confirmed by a mailed copy) or first class mail, postage prepaid, addressed as follows:

      (a) If to NAB:   North American Bancard, LLC.
                        250 Stephenson Hwy
                        Troy, Michigan 48083
                        Attn: General Counsel

      (b) If to Agent:

                    Partners Matters, LLC

                    1641 S Milford Rd, Suite A-104

                    Highland       MI        48357

9.10    Severability. The invalidity of any term of this Agreement shall not affect the validity of any other term, and this Agreement will be construed as if the illegal provision is not contained in this Agreement. The Agreement will be deemed modified to the extent necessary to render enforceable the remaining provisions.

9.11    Section Headings. The section headings contained in this Agreement are for convenient reference only and shall not in any way affect the meaning or interpretation of this Agreement.



Initial(s)

DocuSign Envelope ID: 42B834E1-7B2F-4EBE-A69F-811B78B5A8AB

9.12     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.  Facsimile and electronic copies and signatures may be made and relied upon to the same extent as originals.

9.13     Entire Agreement; Binding Effect. This Agreement, including all schedules, exhibits and attachments, embodies the entire understanding and agreement of the parties with respect to its subject matter. This Agreement shall be binding upon and shall inure only to the benefit of the parties and their respective successors and authorized assigns. Nothing in this Agreement, express or implied, is intended to confer or shall be deemed to confer any rights or remedies upon any persons or entities not parties to this Agreement.

9.14     Jurisdiction; Venue; Governing Law. Jurisdiction and venue for any claim or cause of action arising under this Agreement shall be exclusively in the state or Federal courts of Michigan located in the County of Oakland and this Agreement shall be governed and construed in accordance with the laws of the state of Michigan.

9.15     Survival. Sections 2.8, 2.11, 3.4, 3.5, 4.4, 5.1, and Articles 6, 8 and 9 will survive termination of this Agreement.


**Please sign below to signify that you agree to all terms and conditions contained in this Agreement. The undersigned is duly authorized to sign on behalf of Agent and to bind Agent to the terms and conditions set forth in this Agreement, and certifies that all information provided to NAB in connection with this Agreement are true, correct and complete.  In addition by your signature below on behalf of Agent you authorize NAB to order a consumer credit report on you, Agent and each of Agent's officers, partners, and/or owners, as well as subsequent consumer credit reports, which may be required or used in conjunction with the maintenance, updating, renewal or extension of the services provided hereunder, or in conjunction with reviewing, taking collection action on, or other legitimate purposes associated with this Agreement. The undersigned, on behalf of the Agent, authorizes NAB or its agents to initiate automated deposit or debit (ACH) entries to Agent's bank account as provided for in Section 3.3(c) hereof.**


**Agent**

Signature:  _Duane J Owens_
            DocuSigned by:
            8AB70ED1A872473...

Name:       Partners Matters, LLC

Title:      President / CEO

Date:       6/12/2017


**North American Bancard, LLC.**

Signature:  _____

Name:       _____

Title:      _____

Date:       _____



Initial(s)



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 42B834E17B2F4EBEA69F811B78B5A8AB | | Status: Completed |
| Subject: Documents for your DocuSign Signature | | |
| Source Envelope: | | |
| Document Pages: 13 | Signatures: 3 | Envelope Originator: |
| Supplemental Document Pages: 0 | Initials: 9 | Brian Baby |
| Certificate Pages: 4 | | |
| AutoNav: Enabled | Payments: 0 | 250 Stephenson Hwy |
| EnvelopeId Stamping: Enabled | | Troy, MI  48083 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | bbaby@nabancard.com |
| | | IP Address: 136.146.208.8 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Brian Baby | Location: DocuSign |
| 6/12/2017 1:27:14 PM | bbaby@nabancard.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Duane J Owens<br>admin@partnersmatter.com<br>Security Level: Email, Account Authentication (None)<br><br>Electronic Record and Signature Disclosure:<br>Accepted: 6/12/2017 1:32:12 PM<br>ID: a6e91798-a042-4910-a3c8-aaaea22bcac3 | Duane J Owens<br>8AB70CD1A872473<br><br>Using IP Address: 68.40.252.201 | Sent: 6/12/2017 1:27:17 PM<br>Viewed: 6/12/2017 1:32:12 PM<br>Signed: 6/12/2017 1:39:09 PM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/12/2017 1:27:17 PM |
| Certified Delivered | Security Checked | 6/12/2017 1:32:12 PM |
| Signing Complete | Security Checked | 6/12/2017 1:39:09 PM |
| Completed | Security Checked | 6/12/2017 1:39:09 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## North**American** BANCARD

| | |
|---|---|
| Partnersmatter.com | |
| Revenue Share: 80% | |
| Processor: Electronic Payment Exchange | |

| EPX | |
|---|---|
| Interchange, Dues & Assessments | Pass Through |

| BIN Sponsorship/Risk Hold Back | V/MC/DISC/PAYPAL - 0bps | AMEX Full Acquiring - 18bps |
|---|---|---|

| Authorization Fees | Dial & IP |
|---|---|
| VISA/MC/Discover/American Express FA (AXP) | $0.02 |
| Non-Bankcard Trans (Amex, Diner, JCB, Disc Direct) | $0.02 |
| Debit Trans Fee (Plus Network Acquirer) | $0.02 |
| EBT | $0.02 |
| AVS | $0.00 |
| Batch Fee | $0.00 |
| Visa NET Surcharge | Pass Through |
| Voice Authorization | $1.00 |
| Micros Merchant Link Surcharge | Pass Through |

| Other Fees | |
|---|---|
| Monthly Service Fee (Plus Postage) | $3.00 |
| Monthly Processing Minimum | $0.00 |
| Debit Gateway Fee ($0.00 if No Free Equipment) | $5.00 |
| Annual Fee (if charged not charged, $5.00 if charged) | $0.00 |
| Setup Fee | $5.00 |
| MyBizPerks Merchant Club | $7.75 |
| Retrieval | $10.00 |
| Chargeback | $10.00 |
| Monthly Wireless Gateway Fee GPRS/Comstar | $11.00 |
| Wireless Setup Fee | $0.00 |
| Wireless Transaction Surcharge | $0.03 |
| Micros Merchant Link Surcharge | Pass Through |

| Mobile Payments - Phone Swipe | |
|---|---|
| Per Item Surcharge | $0.05 |
| Monthly Gateway Fee | $9.95 |
| Additional Monthly Gateway Fee | $4.95 |

| PCI & Regulatory | |
|---|---|
| PCI | $0 buy rate & 10% of collected PCI Fees |
| Regulatory | $0 buy rate & 20% of collected Reg Fees |

By Signing, I have read and agree to the information contained in the above.

Name: Duane J OOens

Signature: _(signature)_

Rep # (Office Use):

Date: 6/13/2017

PPEPX05102016

**Inquiry Information**

Services Ran: gVerify, gAuthenticate, CustomerID
Submitted By: wghaleb@nabancard.com

**Check Information**

Routing Number:
Account Number:
Account Type: Checking

**Customer Information**

First Name: Duane
Last Name: Owens
Address Line 1:
City:
State:
Zip Code:
Tax ID (Last 4 Digits):

**Results**

Item Reference ID:
Timestamp:
Bank Name:
Date Account Added To Real-Time Network:
Date Account Information Was Last Updated:

**Verification Results**

Account Response Code:

Customer Response Code:

Verification Response:

# LARA
## Department of Licensing and Regulatory Affairs

**MICHIGAN.GOV**
Michigan's
Official
Web Site

Michigan.gov Home | Business Entity Search Home | Corps Home | Contact Corporations | LARA Home

## LIMITED LIABILITY COMPANY DETAILS

**Searched for:** PARTNERSMATTER LLC
**ID Num:** E85108
**Name:** PARTNERSMATTER LLC
**Type:** Domestic Limited Liability Company

**Resident Agent:** DUANE OWENS

**Registered Office Address:** 1610 ORBAN   MILFORD  MI 48380

**Mailing/Office Address:**
**Formation/Qualification Date:** 5-17-2016
**Jurisdiction of Origin:** MICHIGAN
**Managed by:** Members
**Status:** ACTIVE   **Date:** Present

| View Document Images |
|---|

Return to Search                    New Search

Copyright © 2001- 2017 State of Michigan

# LARA

## Department of Licensing and Regulatory Affairs

**MICHIGAN.GOV**
Michigan's
Official
Web Site

Michigan.gov Home     Business Entity Search Home |   Corps Home |   Contact Corporations   |   LARA Home

## LIMITED LIABILITY COMPANY DETAILS

**Searched for:** PARTNERSMATTER.COM LLC
**ID Num:** E85108
**Name:** PARTNERSMATTER LLC
**Type:** Domestic Limited Liability Company

**Resident Agent:** DUANE OWENS

**Registered Office Address:** 1610 ORBAN   MILFORD   MI 48380

**Mailing/Office Address:**
**Formation/Qualification Date:** 5-17-2016
**Jurisdiction of Origin:** MICHIGAN
**Managed by:** Members
**Status:** ACTIVE    **Date:** Present

| View Document Images |
| --- |

Return to Search                 New Search

Copyright © 2001- 2017 State of Michigan

Partners Matter 1641 s milford rd 48357 - Google Search          https://www.google.com/#q=Partners+Matter+1641+s+milford+rd+4...

Google     Partners Matter 1641 s milford rd 48357                                    🔍                                        Ⓦ

All     Maps     Shopping     News     Images     More                    Settings     Tools

About 72,700 results (0.60 seconds)

**Partners Matter - Services | Facebook**
https://pixel.facebook.com/PartnersMatter/services/?service_id=957953154306788 ▾
Rating: 5 · 1 vote
Services You Need | Partners You Trust. ... See more of Partners Matter by logging into Facebook.
Message ... 1641 S Milford Rd, Ste A-104, Milford, MI 48357.

**Social - Partnersmatter.com**
www.partnersmatter.com/social
Partners Matter offers solutions that drive sales, create unique branding, solve the daily problems ...
1641 S. Milford Rd., Suite A-104,. Highland Twp, MI 48357.

**News Details - Partnersmatter.com**
www.partnersmatter.com/news-details
Partners Matter offers solutions that drive sales, create unique branding, solve the daily problems ...
1641 S. Milford Rd., Suite A-104,. Highland Twp, MI 48357.

**Contact / — PartnersMatter**
https://www.partnersmatter.com/contact/ ▾
PartnersMatter.com 1641 S Milford Rd Suite A-104 Highland Twp MI 48357 (248)504-6100
sales@partnersmatter.com.

**Essential Massage & Wellness Center - Massage - 1641 S Milford Rd ...**
https://www.yelp.com › Beauty & Spas › Massage ▾
Rating: 5 · 2 reviews
(248) 714-9901 · 1641 S Milford Rd Ste B Highland, MI 48357.
Missing: partners matter

**Essential Massage & Wellness Center LLC**
www.essentialmassagewc.com/ ▾
1641 S Milford Rd, Suite B, Highland, MI 48357. We work with clients Monday through Saturday by
appointment. We are closed Sundays and holidays.
Missing: partners matter

**1641 S Milford Rd - Highland MI - MapQuest**
https://www.mapquest.com/us/mi/.../48357/1641-s-milford-rd-42.624161,-83.618270 ▾
View detailed information and reviews for 1641 S Milford Rd in Highland, Michigan and get driving
directions with road conditions and live traffic updates along ...
Missing: matter

**Trusted Local Resources - Kathryn Wayne-Spindler & Associates**
kssattorney.com/resources-2/trusted-local-resources/ ▾
Feb 2, 2015 - If your partner cheated or lied, it can make it doubly difficult to regain trust in people. ... In
the cases of divorce or a death in the family, you have lost perhaps a life partner who handled your
legal and financial matters. ... 1641 S. Milford Road, Suite B Essential Massage and Wellness
Highland, MI 48357

**The Family Holiday Huddle - Raymond James**
https://wagnerandmulderfinancialgroup.website.raymondjames.com/view-resource?... ▾
Openly discussing important matters during the holiday season can bring your family closer. November
... At the very least, you and your spouse or partner should be on the same page. .... 1641 S. Milford
Road Suite C103 Highland, MI 48357.

**NormsMilfordBlog | Random thoughts from a Milford Michigan Realtor ...**
https://normsmilfordblog.com/page/52/?app-download=nokia
Dec 25, 2014 - "It's not what you look at that matters, it's what you see. .... Massage and Wellness
Center – 1641 S Milford Rd, Suite B, Highland, MI 48357. .... forge the deep, lasting relationships with
their life-partners that you see depicted ...



See photos                    See outside

**Partnersmatter.com**

5.0          1 Google review
Business development service in Highland
Township, Michigan                                   Website      Directions

**Address:** 1641 S Milford Rd A-104, Highland, MI 48357

**Phone:** (248) 504-6100

Suggest an edit · Own this business?

Add missing information
Add business hours

Reviews from the web

5/5   Facebook · 1 vote

Reviews
1 Google review          Write a review     Add a photo

Send to your phone                          Send

Feedback

1  2  3  4  5  6  7  8  9  10          Next

Madison Heights, Michigan - From your internet address - Use precise location - Learn more

Help     Send feedback     Privacy     Terms

Partnersmatter.com 1641 s milford rd 48357 - Google Search    https://www.google.com/#q=Partnersmatter.com+1641+s+milford+r...

Google    Partnersmatter.com 1641 s milford rd 48357                        Q

All    Maps    Shopping    News    Images    More            Settings    Tools

About 8 results (0.73 seconds)

**Social - Partnersmatter.com**
www.partnersmatter.com/social
Partnersmatter.com. 1641 S. Milford Rd., Suite A-104,. Highland Twp, MI 48357. 248.504.6100 · Get Directions. NAVIGATION. Home · About · Products · Partners.

**News Details - Partnersmatter.com**
www.partnersmatter.com/news-details
Partnersmatter.com. 1641 S. Milford Rd., Suite A-104,. Highland Twp, MI 48357. 248.504.6100 · Get Directions. NAVIGATION. Home · About · Products · Partners.

**Contact / — PartnersMatter**
https://www.partnersmatter.com/contact/ ▾
PartnersMatter.com 1641 S Milford Rd Suite A-104 Highland Twp MI 48357 (248)504-6100 sales@partnersmatter.com.

**PartnersMatter.com | LinkedIn**
https://www.linkedin.com/company/partnersmatter-com
See who you know at PartnersMatter.com, leverage your professional network, and get ... 1641 S Milford Rd Suite A-104 Highland Twp, MI 48357 United States ...

**1641 S Milford Rd - Highland MI - MapQuest**
https://www.mapquest.com/us/mi/.../48357/1641-s-milford-rd-42.624181,-83.616270 ▾
View detailed information and reviews for 1641 S Milford Rd in Highland, Michigan and get driving directions with road conditions and live traffic updates along ...
Missing: partnersmatter

**Partners Matter - Services | Facebook**
https://pixel.facebook.com/PartnersMatter/services/?service_id=1302137319818960 ▾
Rating: 5 · 1 vote
See more of Partners Matter by logging into Facebook. Message this Page, learn about ... proofing their website! 1641 S Milford Rd, Ste A-104, Milford, MI 48357.

**Partners Matter - Services | Facebook**
https://pixel.facebook.com/PartnersMatter/services/?service_id=1066450150119342 ▾
Rating: 5 · 1 vote
See more of Partners Matter by logging into Facebook. Message this Page, learn ... to full human resources. 1641 S Milford Rd, Ste A-104, Milford, MI 48357.

**Essential Massage & Wellness Center LLC**
www.essentialmassagewc.com/ ▾
1641 S Milford Rd, Suite B, Highland, MI 48357. We work with clients Monday through Saturday by appointment. We are closed Sundays and holidays.
Missing: partnersmatter

*In order to show you the most relevant results, we have omitted some entries very similar to the 10 already displayed.*
*If you like, you can repeat the search with the omitted results included.*

Madison Heights, Michigan - From your internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms



**Partnersmatter.com**
5.0        1 Google review            Website    Directions
Business development service in Highland Township, Michigan

**Address:** 1641 S Milford Rd A-104, Highland, MI 48357
**Phone:** (248) 504-6100

Suggest an edit · Own this business?

**Add missing information**
Add business hours

**Reviews from the web**
5/5   Facebook · 1 vote

**Reviews**                Write a review    Add a photo
1 Google review

Send to your phone                            Send

Feedback

Electronic Record and Signature Disclosure created on: 1/25/2017 12:20:01 PM
Parties agreed to: Duane J Owens

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, North American Bancard (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact North American Bancard:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by paper mail, please send correspondence to:

North American Bancard
250 Stephenson Hwy
Troy, MI 48083

**To advise North American Bancard of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at sweberman@nabancard.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from North American Bancard**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to sweberman@nabancard.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with North American Bancard**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to sweberman@nabancard.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time

providing you with the revised hardware and software requirements, at which time you will
have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to
other electronic notices and disclosures that we will provide to you, please verify that you
were able to read this electronic disclosure and that you also were able to print on paper or
electronically save this page for your future reference and access or that you were able to
e-mail this disclosure and consent to an address where you will be able to print on paper or
save it for your future reference and access. Further, if you consent to receiving notices and
disclosures exclusively in electronic format on the terms and conditions described above,
please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF
  ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can
  print it, for future reference and access; and

- Until or unless I notify North American Bancard as described above, I consent to
  receive from exclusively through electronic means all notices, disclosures,
  authorizations, acknowledgements, and other documents that are required to be
  provided or made available to me by North American Bancard during the course of
  my relationship with you.

# New Agent Setup Form

**Section I: Program Type**

☐ Bonus, Residual & Free Equipment          ☐ Residual Only

**Section II: Residual Split**

New Agent DBA: Partners Matter LLC                    Split %: 80

Regional Manager DBA:              Agent ID:          Split %:

Existing NAB Agent DBA:            Agent ID:          Split %:

Existing NAB Agent DBA:            Agent ID:          Split %:

Existing NAB Agent DBA:            Agent ID:          Split %:

Existing NAB Agent DBA:            Agent ID:          Split %:

Existing NAB Agent DBA:            Agent ID:          Split %:

**Section III: Bonuses**

Paid to:            ☑ Agent            ☐ Regional Manager

Request Paid On:    ☐ Approval         ☐ Activation

Program:            ☐ Standard         ☐ Freedom

Paid When:          ☑ Daily            ☐ Weekly

**Section IV: Agent Portal Access**

Access Level:       ☑ Full Access      ☐ Lite Access

**Submitted By:**

Existing NAB Agent DBA:                    Agent ID: